IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-02071-MSK-CBS

CLARA E. SALAZAR, and
JUANITA YBARRA, on behalf of themselves and others similarly situated,
        Plaintiffs and Proposed Collective and Class Action Representatives,
v.

BUTTERBALL, LLC,
        Defendant.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

_____

Magistrate Judge Craig B. Shaffer

This civil action comes before the court on: (1) Defendant's Motion for Summary Judgment (filed May 15, 2009) (doc. # 40); (2) "Plaintiffs' Motion for Partial Summary Judgment on Butterball's 29 U.S.C. § 203(o) Affirmative Defense" (filed May 15, 2009) (doc. # 41); and (3) "Plaintiffs' Motion for Class Certification and Collective Action Certification" (filed May 15, 2009) (doc. # 34).  Pursuant to the Order of Reference dated September 30, 2008 (doc. # 5) and the memoranda dated June 23, 2009 (docs. # 58, # 61, and # 62), these matters were referred to the Magistrate Judge.  The court has reviewed the Motions, the Responses filed on June 4, 2009 (docs. # 45 and # 48) and  June 8, 2009 (doc. # 51), the Replies filed on June 22, 2009 (docs. # 54 and # 55) and June 23, 2009 (doc. # 56), the numerous exhibits, the entire case file, and the applicable law and is sufficiently advised in the premises.

I.      Standard of Review

Rule 56 expressly authorizes summary adjudication when there is no genuine dispute as to any material fact and . . . the moving party is entitled to judgment as a matter of law.  This standard requires a court to make two distinct determinations; one as a prerequisite to the other. The first determination is whether there is a genuine dispute as to any issue of material fact. If there is such a dispute, the motion must be denied.  Only when all material facts are undisputed can a court move to the second

1

determination, that of applying the law to the undisputed facts to enter a judgment. . . .

Substantive law frames the material facts and factual issues by specifying the elements that must be proved to establish a claim or defense, setting the standard of proof and identifying the party with the burden of proof.  Material issues may pertain to a specific fact (such as whether an event occurred) or may relate to the significance or import of certain facts (such as whether the facts demonstrate intent).  However, not all facts relevant in a lawsuit are material to a Rule 56 motion. The material facts are only those which tend to prove or disprove an element of the subject claim or defense.  Thus, to isolate the factual issues pertinent to the determination of a particular Rule 56 motion, it is essential to derive the elements of the claim or defense from the governing substantive law. . . .

A factual dispute is genuine for purposes of Rule 56 when the evidence presented in support and opposition to the motion is so contradictory that, if presented at trial, a reasonable jury could return a verdict for either party.  The test of genuineness measures the extent or degree of the factual dispute.  A scintilla of contrary evidence does not create a genuine dispute, nor does reliance upon the allegations in a party's pleadings.  A genuine dispute means that the party opposing the Rule 56 motion has produced enough contrary evidence that had such evidence been presented at trial, no directed verdict could be entered in accordance with Fed.R.Civ.P. 50(a).  According to Rule 50(a), a trial judge may direct a verdict if the governing law applied to the evidence can yield only one outcome.  If reasonable minds can differ as to the import or the weight of the evidence, a verdict cannot be directed and, by analogy, a summary judgment cannot be entered. . . .

If the movant has the burden of proof, the movant must establish every element of its claim or defense by sufficient, competent evidence to set forth a prima facie case.  Once the moving party has met its burden, to avoid summary judgment the responding party must demonstrate that there is a genuine factual dispute with regard to some element that the moving party is obligated to prove. This is done by presenting sufficient, contradictory evidence which, if presented at trial, would allow a jury to return a verdict in the responding party's favor.  The responding party cannot rest on its pleadings but, instead, must set forth specific facts by competent evidence, and a court is required to construe all inferences in favor of the respondent so as to preserve the possibility of trial. . . .

The filing of cross motions does not mean that the material facts are undisputed even if the parties focus on the same claim or defense. Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a prima facie case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently.

*Ribozyme Pharmaceuticals, Inc. Securities Litigation*, 209 F. Supp. 2d 1106, 1109-1112 (D. Colo. 2002) (citations omitted).

II.    Statement of the Case

Plaintiff Salazar was formerly employed and Plaintiff Ybarra is currently employed by Defendant Butterball, Inc. ("Butterball"), a North Carolina limited liability company, at its Longmont, Colorado turkey processing plant.  Ms. Salazar was employed at the Longmont processing facility from 1981 to 2009.  Ms. Salazar's last day of work was February 27, 2009.  (*See* Deposition of Clara Salazar ("Salazar Dep."), Butterball's Exhibit A (doc. # 40-2 at p. 5).  Ms. Ybarra has been employed at the Longmont processing facility from 1978 to the present.  Plaintiffs are nonexempt, hourly-paid production workers and have been members of and represented by the United Food and Commercial Workers Local No. 7 ("UFCW Local 7"or "the Union") throughout their employment with Butterball.  (*See* Salazar Dep., Plaintiffs' Exhibit 1 (doc. # 41-2 at p. 3 of 76; Deposition of Juanita Ybarra ("Ybarra Dep."), Plaintiffs' Exhibit 2 (doc. # 41-2) at pp. 15-16 of 76.  During their employment Plaintiffs have been covered by collective bargaining agreements ("CBAs") between UFCW Local 7 and Butterball.  (*See id.*).

Prior to July 31, 2006, ConAgra Packaged Foods Company, Inc. ("ConAgra") owned and operated the Longmont turkey processing facility.  On July 31, 2006, Smithfield Foods, Inc. ("Smithfield") and ConAgra concluded an asset purchase agreement transferring control of the facility to Smithfield. (*See* Asset Purchase Agreement, Butterball's Exhibit D (doc. # 40-5)).  On October 2, 2006, Smithfield assigned ownership of the facility to Butterball.  (*See* Partial Assignment and Assumption Agreement, Butterball's Exhibit E (doc. # 40-6); see also Deposition of Karen Ingram ("Ingram Dep."), Butterball's Exhibit F (doc. # 40-7) at p. 74).  Upon acquiring the Longmont plant, Butterball retained the same workforce, the same management, the same assets and equipment, and the same payment practices.  (*See id.* at pp. 46, 104;  Deposition of James Walter Davis ("Davis Dep.") (doc. # 40-10) at pp. 27, 37, 47)).

Plaintiffs seek relief under a proposed collective action pursuant to the Fair Labor

Standards Act, 29 U.S.C. § 201 *et seq.*, and a proposed class action pursuant to the Colorado Minimum Wage Act ("CMWA"), Colo. Rev. Stat. §§ 8-6-101, *et seq.*, and Colorado Minimum Wage Order 24 ("Order 24"), Colo. Code Regs. § 1103-1.  (*See* Complaint (doc. # 1) at ¶¶ 1, 24, 27, 37, 42).  Plaintiffs allege that Butterball has not compensated its employees for all hours worked as required by federal and Colorado law. (See *id.* at ¶ 20).  More specifically, Plaintiffs allege that Butterball: (1) "has not paid its nonexempt employees full overtime compensation for all hours worked as required by federal and state law;"  (2) "refuses to fully compensate its hourly production and support employees for the time spent at the beginning of shifts donning and doffing and sanitizing required gear and equipment;"  (3) "does not compensate its hourly production and support employees for time spent donning and doffing before and after their unpaid lunch breaks and their paid rest breaks;" and (4) "does not compensate its nonexempt workers for time spent walking to and from changing areas and the production floor," in violation of "the FLSA and Colorado wage and hour laws."  (*See* Complaint (doc. # 1) at ¶ 20).

Butterball moves for summary judgment on Plaintiffs' FLSA and state law causes of action for several reasons.  First, pursuant to § 203(o) of the FLSA, "[i]n determining . . . the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time . . . by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee." 29 U.S.C. § 203(o).  Butterball asserts that because it and its predecessor, ConAgra have consistently had a custom or practice under a bona fide CBA of nonpayment for time spent donning and doffing required gear and equipment, such time is not considered to be hours worked under the FLSA and thus Plaintiffs cannot recover for that time as a matter of law. (*See* Butterball's "Thirty First Defense" (doc. # 8 at p. 14 of 16)).  In addition, Butterball asserts that under the FLSA it is not legally required to pay for the donning and doffing time

Plaintiffs claim because the gear and equipment is non-unique and relatively effortless to put on and take off.   Thus, Butterball argues that time spent donning and doffing non-unique gear is not compensable work time and is also non-compensable as de minimis time.  Butterball next argues that Plaintiffs' state law claims must be dismissed to the same extent as Plaintiffs' FLSA claims, as Colorado courts apply federal authority to interpret state law where the latter is patterned from the former.   Butterball further argues that Plaintiffs' state law claims must be dismissed because Butterball is not a private sector employer belonging to any of the four industries governed by Order 24 and thus is not governed by Order 24.  (*See* Butterball's "Thirty Second Defense" (doc. # 8 at p. 14 of 16)). Plaintiffs in turn move for partial summary judgment in their favor on Butterball's Thirty First Defense, arguing that Butterball cannot demonstrate the essential elements of its § 203(o) defense.

III.    Analysis

A.    Plaintiffs' First Cause of Action for Violation of the FLSA

The FLSA requires employers to pay minimum wage for each hour it employs an employee, as well as an overtime premium for hours worked in excess of forty per week. (See 29 U.S.C. §§ 206, 207, 213).  The central dispute in this lawsuit is whether Butterball is required to compensate Plaintiffs for the time it takes to put on required protective gear before their paid shift commences.  Plaintiffs contend that because Butterball does not pay them for donning, doffing, and sanitizing required gear at the beginning of shifts, before and after unpaid lunch breaks and paid rest breaks, and for time spent walking to and from changing areas and the production floor, they have worked in excess of 40 hours per week and have not been compensated for such overtime, in violation of 29 U.S.C. § 207(a)(1). A threshold question in this case is whether the activities cited by Plaintiffs – donning and doffing, sanitizing, and walking – constitute compensable work under the FLSA.

Section 203(o) of the FLSA specifically defines hours worked as excluding "any time spent in changing clothes or washing at the beginning of end of each workday which was excluded from measured working time . . . by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee." 29 U.S.C. § 203(o). "Section 203(o) is not an exemption under the FLSA" that should be construed narrowly, "but is instead a definition that limits the scope of the FLSA's key minimum wage and maximum hour provisions." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 956-57 (11th Cir. 2007), *cert. denied*, 128 S. Ct. 2902 (2008). "[C]onstruing § 203(o) narrowly against employers as an FLSA 'exemption' contravenes not only basic tenets of statutory construction but also the readily apparent intent of the legislators who approved the amendment's language." *Andersen v. Cagle's*, 488 F.3d at 958. *See also Pellon v. Business Representative Intern., Inc.*, 528 F. Supp. 2d 1306, 1310 (S.D. Fla. 2007) (not adhering to other jurisdictions' stricter construction of FLSA definitions) (citing *Anderson*, 488 F.3d at 955-56).

Butterball asserts that the activities cited by Plaintiffs do not constitute compensable work under § 203(o). To prevail pursuant to § 203(o), Butterball must show that: (1) the challenged time was spent "changing clothes;" and (2) under the governing CBA, there is a custom or practice of nonpayment for the time spent donning, doffing, sanitizing, and walking. *See Kassa v. Kerry, Inc.*, 487 F. Supp. 2d 1063, 1065 (D. Minn. 2007) (Defendant "entitled to summary judgment only if, on this record, both questions must be answered 'yes.'"). *See also Valladon v. City of Oakland*, 2009 WL 3401263 at * 10 (N.D. Cal. Oct. 20, 2009) (§ 203(o) is an affirmative defense) (citing *Figas v. Horsehead Corp.*, 2008 WL 4170043 at * 13 (W.D. Pa. Sept. 3, 2008) ("§ 203(o) is an affirmative defense.")).

1.      Whether Time Was Spent "Changing Clothes" under 29 U.S.C. 203(o)

For food and employee safety, production employees at the Longmont facility are

required to wear personal protective equipment ("PPE").  (*See* Ingram Dep. (doc. # 41-2) at p. 28 of 76).  The parties vigorously dispute the question whether the PPE worn by production employees constitutes "clothes" within the meaning of § 203(o).  Relying on *Alvarez v. IBP, Inc.*, 339 F.3d 894, 90405 (9th Cir. 2003), *aff'd on other grounds*, 546 U.S. 21 (2005), Plaintiffs contend that the their PPE does not constitute "clothes" and the act of donning and doffing their PPE does not constitute "changing clothes" for purposes of § 203(o).  Butterball argues that the various articles of PPE that Plaintiffs wear constitute clothes and that thus the time spent donning and doffing such PPE is excluded under § 203(o) as "changing clothes."

Butterball's Longmont facility is divided into different departments, each with their own scheduled start times.  (*See* doc. # 40-7 at p. 6).  All production employees receive two thirty-minute breaks each day.  (*See* doc. # 40-7 at pp. 16-17).  Butterball pays the production employees for one thirty minute break including all donning and doffing time associated with the break.  (*See id.*; *see also* Salazar Dep., Butterball's Exhibit A (doc. # 40-2) at p. 37).  Butterball requires Plaintiffs to arrive before their paid scheduled shift begins to don the PPE.  Plaintiffs also doff their PPE in conjunction with their paid and unpaid breaks and immediately after their paid shift ends.

From May 14, 1981 to approximately 1993, Plaintiff Salazar worked in the Boning Area on the assembly line as a "Knife." (See Salazar Dep., Butterball's Exhibit A (doc. # 40-2) at pp. 17, 19-20, 22, 42; *see also* Clara E. Salazar's Answers to Defendant's Amended First Set of Interrogatories ("Salazar Interrogatory Responses"), Butterball's Exhibit B (doc. # 40-3) at pp. 5-6).  From 1993 through October 2008, Ms. Salazar worked as a general laborer in the boning department.  (*See* doc. # 40-2) at p. 42; doc. # 40-3 at p. 5).  When Ms. Salazar worked in the Boning Department, she donned a frock, glove liners, plastic sleeves, hair net, yellow apron, boots, hard hat, ear protection, safety glasses, mesh gloves and arm guard.  (Salazar Interrogatory Responses (doc. # 40-3) at pp. 6, 7).  From January

2009 through February 18, 2009, Ms. Salazar worked in the Lower 20 Packaging Department.  (*See* # 40-2 at p. 22; doc. # 40-3 at p. 5).  When Ms. Salazar worked in the Packaging Department, she acquired and donned a hair net, blue coat, hard hat, ear protection, liner gloves, overshoes, and plastic apron with sleeves attached to rubber gloves. (*See* doc. # 40-2 at p. 8).  For approximately one week, from February 19, 2009 to February 27, 2009, Ms. Salazar worked in the cafeteria as a cleaning person.  (*See* doc. # 40-2 at p. 45).  While working In the cafeteria, Ms. Salazar was required to wear a helmet, hair net, frock, and earplugs.  (*See* Salazar Dep. (doc. # 40-2) at p. 45).

From 1978 to 2001, Plaintiff Ybarra worked on the evisceration line, in different capacities.  (*See* Juanita Ybarra's Answers to Defendant's Amended First Set of Interrogatories ("Ybarra Interrogatory Responses"), Butterball's Exhibit C (doc. # 40-4) at p. 5).  From approximately 2001 to 2005, Ms. Ybarra worked as a lab assistant.  (*See id.*).  From approximately 2005 through November 2008, Ms. Ybarra worked on the evisceration line.  (*See id.*; *see also* Ybarra Dep., Butterball's Exhibit J (doc. # 40-11) at p. 9).  When working on the evisceration line, Ybarra wore a frock, plastic apron, additional plastic under her apron, plastic sleeves, cotton glove liners, rubber gloves, boots, hard hat, hair net, earplugs, safety glasses and occasionally, mesh gloves.  (*See* Ybarra Interrogatory Responses (doc. # 40-4) at p. 7).  From November 2008 to the present, Ms. Ybarra has worked in the Lower 20 Packaging Department. (*See* doc. # 40-4 at p. 7 of 14).  Since Ybarra has worked in the Packaging Department, she  dons a hair net, blue coat, hard hat, ear protection, glove liners, overshoes, plastic apron with sleeves attached and rubber gloves. (*See id.* at pp. 8-9.)

The boning, evisceration and "Live Hang" departments were paid on gang time. (Ingram Dep. (doc. # 40-7) at p. 106).  According to gang time, a shift is measured from the time the first piece of turkey arrives at a particular station until the time the last piece of turkey leaves that station, using a scheduled start time and a scheduled stop time.  (Ingram

Dep. (doc. # 40-7) at pp. 6, 106-07, 109-10; see also Ybarra Dep. (doc. # 40-11) Butterball's Exhibit J at p. 19). In other words, employees begin getting paid when the first piece of turkey arrives at their particular station. (*See* Ingram Dep. (doc. # 40-7) at pp. 11-12). The six employees in the Live Hang department received an extra 20 minutes of pay or plug time for donning and doffing time. (*See* Ingram Dep. (doc. # 40-7) at pp. 47, 69); *see also* Davis Dep. at p. 25). Other than the Live Hang employees, neither ConAgra nor Butterball have paid production employees additional plug time for donning and doffing time. (*See* Ingram Dep. (doc. # 40-7) at p. 16).[1]

For employees not paid purely on gang time, Butterball pays employees on a hybrid gang time/out punch system where time is measured from the shift start time to the time of each employee's out punch. (*See* Ingram Dep. (doc. # 40-7) at pp. 6, 45, 109-10). Thus, employees not working in evisceration or boning use a scheduled start and a punch end time. (*See* Ingram Dep. (doc. # 40-7) at pp. 109-10). For the departments currently in operation, Butterball pays all employees based on this hybrid system. (*See* Ingram Dep. (doc. # 40-7) at p. 44). Some employees doff on the clock prior to punching out while others swipe prior to doffing their PPE. (*See* Ingram Dep. (doc. # 40-7) at p. 45).

To date, neither the Tenth Circuit nor any district court in the Tenth Circuit have addressed § 203(o). In *Reich v. IBP, Inc.*, 820 F. Supp. 1315 (D. Kan. 1993), "the trial court had held that the donning and doffing of specialized protective clothing and gear worn by knife-wielding employees was compensable because the wearing of those items was 'an integral and indispensable part' of the work of those employees." *Garcia v. Tyson Foods*, 474 F. Supp. 2d 1240, 1244 (D. Kan. 2007) (citing *Reich v. IBP, Inc.*, 38 F.3d 1123

---

[1]     Butterball discontinued operation of its evisceration and boning lines as well as its Live Hang department in November 2008. (*See* Ingram Dep. (doc. # 40-7) at p. 47, Deposition of Walter Davis ("Davis Dep."), Butterball's Exhibit I (doc. # 40-10) at p. 101). The Longmont facility no longer has a slaughter facility for live turkeys. It receives deboned meat from other Butterball facilities for further processing, cooking, and packaging. (*See* Ingram Dep. (doc. # 40-7) at pp. 85-86).

(10th Cir. 1994)).  The District Court based its determination on the conclusion "that the donning and doffing of non-unique gear was uniformly required throughout many industries and thus not an integral and indispensable part of meat production workers' jobs." *Jordan v. IBP, Inc.*, 2004 WL 5621927 * 2 (M.D. Tenn. 2004).  On appeal, "the Tenth Circuit held that the donning and doffing of standard protective clothing and gear is not 'work' within the meaning of the FLSA and therefore not compensable." *Garcia v. Tyson Foods*, 474 F. Supp. 2d at 1244 (citing *Reich*, 38 F.3d at 1123.  The Tenth Circuit "agreed with the trial court's conclusions regarding compensability, but did so for 'slightly different reasons,' expressly rejecting the trial court's conclusion that the wearing of protective clothing and gear was not integral and indispensable to the work performed by production workers" and holding "that a 'better explanation for the non-compensability of the donning and doffing of the latter items is that it is not work within the meaning of the FLSA.'" *Garcia*, 474 F. Supp. 2d at 1245-46.  *See also Jordan*, 2004 WL 5621927 at * 2.

After the Supreme Court's decision in *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005), the Tenth Circuit re-affirmed *Reich*.  *See Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1289 (10th Cir. 2006).  In *Smith*, the plaintiffs asserted that their workday started when they loaded their personal safety equipment including their hard hats, gloves, steel-toed boots, and coverall clothing into their vehicle. The Tenth Circuit rejected this argument as "foreclosed by our holding in Reich . . . where we explained that when an employee's activity 'takes all of a few seconds and requires little or no concentration,' then the activity is 'properly considered not work at all.'" 462 F.3d at 1289.  "Moreover, '[r]equiring employees to show up at their work stations with such standard equipment [as a hard hat, safety glasses, earplugs and safety shoes] is no different from having a baseball player show up in a uniform, . . . or a judge with a robe.  It is simply a prerequisite for the job and is purely preliminary in nature." *Id.* (citing *Reich*, 39 F.3d at 1125, 1126 n.1).  *See also Alford v. Perdue Farms, Inc.*, 2008 WL 879413 * 4 (M.D. Ga. Mar. 28, 2008)  ("Reich has

not been overruled . . ." and "remains instructive for its finding that the activities of donning and doffing the generic protective gear were comparable to normal dressing and washing and its holding that they were inherently preliminary or postliminary to the principal work activity.").

       a.    DOL Opinion Letters

The United States Department of Labor ("DOL") has issued four opinion letters discussing the applicability of 203(o) to donning and doffing.  In 1997, the DOL found that § 203(o) "does not apply to the putting on, taking off, and washing of protective safety equipment, and, therefore, time spent on these otherwise compensable activities cannot be excluded from hours worked . . . ."  (*See* Wage & Hour Div., U.S. Dept. of Labor, Opinion Letter, 1997 DOLWH LEXIS 56 (Dec. 3, 1997), Butterball's Exhibit P (doc. # 40-17) ("the phrase 'changing clothes or washing' in section 3(o) does not include the putting on, taking off, or washing of that protective safety equipment utilized in the meat packing industry which is integral to the performance of an employee's principal activity.").  The DOL reiterated this position in a second opinion letter on January 15, 2001.  (*See* Wage & Hour Div., U.S. Dept. of Labor, Opinion Letter, 2001 DOLWH LEXIS 1 (Jan. 15, 2001), Butterball's Exhibit Q (doc. # 40-18)).

On June 6, 2002 the DOL issued a new opinion letter that withdrew the two previous letters and reversed the DOL's position. (*See* Wage & Hour Div., U.S. Dept. of Labor, Opinion Letter, FLSA 2002-2 (June 6, 2002), Butterball's Exhibit R (doc. # 40-19) ("2002 DOL Opinion Letter").  The DOL stated "[i]t is our view, based upon a reexamination of the statute and legislative history, that the 'changing clothes' referred to in section 3(o) applies to the putting on and taking off of the protective safety equipment typically worn in the meat packing industry."  (*Id.*).  In support of this position, the DOL cited an Occupational Health and Safety Administration ("OSHA") regulation's description of a face shield as protective

clothing.  (*See id.* (also describing aprons, gloves, and other protective clothing)).  The DOL reviewed the Supreme Court's use of the phrase "protective clothing" in *Steiner v. Mitchell*, 350 U.S. 247, 255-56 (1956), *Industrial Union Department, AFLCIO v. American Petroleum Institute*, 448 U.S. 607, 660-61 (1980), and *United States v. Stanley*, 483 U.S. 669, 671, 690 (1987), recognizing "that the purpose of clothing specially worn for the workplace might well be protection."  (*See* doc. # 40-19).  The DOL further clarified "[t]hat an article may be 'cumbersome' also is not an indication that it is not clothing" and "that an item is worn on top of another item plainly is not reason to believe they are not both items of clothing." (*See id.*).  The DOL summarized "we believe that the term 'clothes' in section 3(o) includes the protective safety equipment typically worn by meat packing employees.  Accordingly, we interpret 'clothes' under section 3(o) to include items worn on the body for covering, protection, or sanitation. . . ."  (*See* doc. # 40-19 at p. 4 of 4).

In a subsequent opinion letter issued on May 14, 2007, the DOL reiterated the position stated in the 2002 DOL Opinion Letter.  (*See* Wage & Hour Div., U.S. Dept. of Labor, Opinion Letter, 2007 DOLWH LEXIS 10 (May 14, 2007) ("2007 DOL Opinion Letter"), Butterball's Exhibit S (doc. # 40-20)).  The 2007 DOL Opinion Letter adopted the position and reasoning of the 2002 DOL Opinion Letter, concluding that "clothing includes, among other items, heavy protective safety equipment worn in the meat packing industry such as mesh aprons, sleeves and gloves, plastic belly guards, arm guards and shin guards."  (*See* doc. # 40-20 at p. 3 of 3).  The DOL addressed *Alvarez*, 339 F.3d at 894, and stated that "the Division has not changed its interpretation as a result of the circuit court's opinion and continues to believe that the opinion letter is correct for the reasons stated therein."  (*See id.*).  "It remains our view, based upon the statute and legislative history, that the 'changing clothes' referred to in section 3(o) applies to putting on and taking off the protective safety equipment typically worn by employees in the meat packing industry."  (*See id.*).

"The DOL opinion letters receive deference in accordance with *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) . . . , under which the weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Sisk v. Sara Lee Corporation*, 590 F. Supp. 2d 1001, 1008 (W.D. Tenn. 2008) (citing *Gonzales v. Oregon*, 546 U.S. 243, 269 (2006) ("[U]nder *Skidmore*, we follow an agency's rule only to the extent it is persuasive.)) and *Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc.*, 204 F.3d 673, 677 (6th Cir. 2000) (applying *Skidmore* deference to opinions of the DOL and finding that such opinions have "persuasive value if the position of the Administrator is well-considered and well-reasoned")). *See also McGraw v. Barnhart*, 450 F.3d 493, 501 (10th Cir. 2006) ("Under *Skidmore*, the degree of deference given informal agency interpretations will vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.") (internal quotation marks and citations omitted).

The court finds that deference to the 2002 and 2007 DOL Opinion Letters is appropriate and that the Opinion Letters are persuasive. *See Clements v. Serco, Inc.*, 530 F.3d 1224, 1229 (10th Cir. 2008) (court reviewing FLSA case deferred to DOL opinion letters as persuasive). "[W]here the regulatory scheme is highly detailed" and the agency "can bring the benefit of specialized experience to bear" on the subtle interpretations of the FLSA, the Opinion Letters merit deference. *See United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001) (recognizing "*Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information available to the agency"). While the agency shifted its position after 2001, the agency's position reflects a consistent practice over a number of years since 2002. *See McGraw*, 450 F.3d at 501 (citing *Good Samaritan Hosp. v. Shalala*,

508 U.S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due.")). *But see Alvarez*, 339 F.3d at 905 n. 9 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n. 30 (1987) ("an agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view"). In finding that the DOL Opinion Letters are entitled to deference, this court "agrees that, although the 2002 and 2007 opinions represent a shift from the 1997 and 2001 opinions issued by the DOL, the latter opinions are more thorough and based upon a more sound interpretation of the statute." *Sisk*, 590 F. Supp. 2d at 1008-09 (quoting *Andersen*, 488 F.3d at 956-57 ("[w]hile less deference may be called for, the most recent advisory opinion is entitled to some deference just the same. Moreover this most recent opinion provides a far more detailed rationale for its conclusion that the previous opinions. Thus, all things being equal, the more recent opinion is a great deal more persuasive than the earlier ones.")). The agency's later "position appears thoroughly considered and expresses valid reasoning." *McGraw*, 450 F.3d at 501.

### b.    Legislative Intent

The agency's position is consistent with the legislative history of § 203(o). As the DOL noted, "a less rigid definition of 'clothes' comports with Congress's intent in enacting section 3(o), which was to give a measure of deference on this aspect of wage-hour practice to the agreements and judgments shared by companies and their employees' duly-designated representatives for purposes of negotiating the terms and conditions of employment." (*See* doc. # 40-19 at p. 4 of 4; *see also* p. 3 of 4 ("The function of section 3(o) is to allow companies and unions to agree to treat as non-compensable clothes-changing activities that otherwise would be compensable under the Portal Act."). "The legislative history behind § 203(o) also supports a broad reading of 'clothes.'" *Hudson v.*

*Butterball, LLC*, 2009 WL 3486780 at * 2 (W.D. Mo. Oct. 14, 2009).  "Congress' intent in enacting § 203(o) was to give unions and employers the power to decide whether time spent changing clothes and washing would be compensable." *Hudson,* 2009 WL 3486780 at * 2 (citation omitted).  *See also Figas v. Horsehead Corp.*, 2008 WL 4170043 at * 9 (W.D. Pa. Sept. 3, 2008) ("Section 203(o), . . . evinces a legislative determination that, . . . deference to the terms of a bona fide collective-bargaining agreement may be more in keeping with the FLSA's spirit of protecting the interests of covered workers . . . .") (quoting statement of § 203(o)'s sponsor, Representative Christian Herter, 95 Cong. Rec. H11210 ("This amendment is offered . . . to give sanctity once again to the collective-bargaining agreements . . .")).

      c.     Legal Authority Interpreting "Changing Clothes" under Section 203(o)

      The agency's position is also consistent with a substantial body of caselaw supporting the determination that the Plaintiffs' PPE constitutes clothes and that the act of donning and doffing their PPE constitutes "changing clothes" for purposes of § 203(o). *See, e.g., Andersen v. Cagle's*, 488 F.3d at 956 ("Our interpretation of the term 'changing clothes is consistent with that of the agency responsible for administering the FLSA. . . for the purpose of applying § 203(o), clothes 'include items worn on the body for covering, protection, or sanitation.' . . . We hold that § 203(o) applies to the clothes changing activities at issue in this case.") (quoting 202 DOL Opinion Letter);  *Bejil v. Ethicon, Inc.*, 269 F.3d 477, 480 n. 3 (5th Cir. 2001) (rejecting employees' argument that the sanitary garments at issue – lab coats, dedicated shoes or shoe coverings, and hair or beard coverings – were not "clothes" under § 203(o), and holding that such items "all appear to fall under the definition of 'clothes'");  *Andrako v. United States Steel Corp.*, 632 F. Supp. 2d 398, (W.D. Pa. 2009) (finding that "flame retardant jackets, boots, snoods, and hard hats" "unquestionably fall within . . . any common definition of clothes");  *Sisk*, 590 F. Supp.

2d at 1009 (concluding "that the specialized PPE at issue here constitutes "clothes" for purposes of § 3(o)," based on deference to the DOL's position, "the common, ordinary meaning ascribed to the word," and the legislative purpose of § 203(o)); *Figas v. Horsehead Corp.*, 2008 WL 4170043 at * 10 ("Like the Fifth and Eleventh Circuits, this Court is unpersuaded by the argument that 'protective clothing' is categorically beyond the scope of the word 'clothes' appearing in § 203(o)."); *Kassa*, 487 F. Supp. 2d at 1066-67 ("[b]ecause protective gear is worn in the same manner as other clothing," and "the legislative history of § 3(o) also demonstrates that protective gear is within the intended meaning of the term "clothing," it was reasonable to interpret safety glasses, pants, shirts, smocks, and boots as "clothing"); *Anderson v. Pilgrim's Pride Corp.*, 147 F. Supp. 2d 556, 561, 564-65 (E. D. Tex. 2001) (assuming, without discussion, that hairnets, ear plugs, rubber boots, and gloves were "clothes" under § 203(o)); *Saunders v. John Morrell & Co.*, 1991 WL 529542, at *1, *3-4 (N. D. Iowa Dec. 24, 1991) (Butterball's Exhibit O (doc. # 40-16) (assuming, without discussion, that gloves, goggles, helmets, arm guards, belly guards, knife guards, steel-toed shoes, rubber boots, and steel-mesh aprons were "clothes" under § 203(o)).

Plaintiffs' reliance on the Ninth Circuit's decision in *Alvarez*, 339 F.3d at 894, and the cases following it is unpersuasive to this court.  The Ninth Circuit determined that the PPE at issue did not "plainly and unmistakably" fit within § 203(o)'s "clothing term."  *See Alvarez*, 339 F.3d at 905.  The Supreme Court limited its *certiorari* review and did not specifically address the application of § 203(o).  *See Alvarez*, 543 U.S. 1144 (Feb. 22, 2005) (granting petition for writ of certiorari "limited to Question 1 presented by the petition"); *Alvarez*, 2004 WL 424055 (Feb. 26, 2004) (Petition for Writ of Certiorari) (Question 1 presented "[w]hether walking that occurs between compensable clothes-changing time and the time employees arrive at or depart from their actual work stations constitutes non-compensable 'walking . . . to and from the actual place of performance of the principal activity' within the meaning

of Section 4(a)" of the Portal-to-Portal Act of 1947, 29 U.S.C. § 254(a));  *Alvarez*, 546 U.S. at 24 ("the principal question . . . is whether the time employees spend walking between the changing area and the production area is compensable under the FLSA. The second question . . . is whether the time employees spend waiting to put on the protective gear is compensable under the statute.").  Further, the *Alvarez* court's narrow construction of § 203(o) as an exemption rather than a definition  has since been criticized as "flaw[ed]." *Hudson v. Butterball*, 2009 WL 3486780 at * 3 (W.D. Mo. Oct. 14, 2009).  *See also Anderson*, 488 F.3d at 956-57 ("Section 203(o) is not an exemption under the FLSA" that should be construed narrowly, "but is instead a definition that limits the scope of the FLSA's key minimum wage and maximum hour provisions.");  *Pellon*, 528 F. Supp. 2d at 1310 (not adhering to other jurisdictions' stricter construction of FLSA definitions) (citing *Anderson*, 488 F.3d at 955-56).  This court determines that as a matter of law Plaintiffs' PPE are "clothes" within the meaning of § 203(o).

2.      Custom or Practice of Nonpayment under the Governing CBAs

        To prevail on its § 203(o) affirmative defense, Butterball must establish not only that the  time at issue was spent "changing clothes," but also that under the governing CBA, there is a custom or practice of nonpayment for the time spent donning and doffing.  *Kassa v. Kerry, Inc.*, 487 F. Supp. 2d at 1068.  *See also Sandifer v. U.S. Steel Corp.*, 2009 WL 3430222 at * 7 (N.D. Ind. Oct. 15, 2009) ("To prevail on its § 203(o) defense, [Defendant] must establish not only that the items at issue in this case are "clothes"– which it has done – but also that the applicable CBA contains express terms excluding compensation for changing clothes and washing or there is a 'custom or practice' under the applicable CBA of not paying workers for those pre- and post-shift activities.").

        Butterball contends that there is a clearly established "custom or practice" of nonpayment for donning and doffing time under a series of CBAs in which the Union has

acquiesced.  Butterball argues pursuant to § 203(o) that because it and its predecessor, ConAgra have consistently had a custom or practice under bona fide CBAs of nonpayment for time spent donning and doffing required gear and equipment, such time is not considered to be hours worked under the FLSA.

Plaintiffs, as production employees, are represented by the Union, UFCW Local 7. (*See* Deposition of James Walter Davis ("Davis Dep.") (doc. # 40-10) at p. 96).  Other non-production employees are represented by the International Union of Operating Engineers ("IUOE").  (*See id.*).  Currently, there are 234 active UFCW Local 7 members and 116 IUOE members. (*See* doc. # 40-10 at p. 96).  At all relevant times, the parties have operated under the terms of collective bargaining agreements.  The CBA that was in effect during the time period of 2005–2008 is entitled "Agreement Between ConAgra Foods and United Food and Commercial Workers, Local No. 7."  (*See* "2005-2008 CBA", Butterball's Exhibit K (doc. # 40-12) **[under seal]**;  *see also* Davis Dep. (doc. # 40-10) at p. 31).  The CBA in effect from 2008-2009 is entitled "Agreement Between Butterball, LLC and United Food and Commercial Workers, Local No. 7.  (See "2008-2009 CBA" ), Butterball's Exhibit L (doc. # 40-13) **[under seal]**.

Butterball considers wages and working conditions, which includes pay for donning and doffing time, to be a mandatory subject of collective bargaining.  (*See* Ingram Dep. (doc. # 40-7) at pp. 16, 64–65; Davis Dep. (doc. # 40-10) at p. 80).  The 2005-2008 and 2008-2009 CBAs do not provide for payment for donning and doffing of equipment.  (*See* Butterballs' Exhibits K, L (docs. # 40-12 and # 40-13) **[under seal]**).  It is undisputed that the subject of compensation for donning and doffing has never been raised either by UFCW Local 7 or Butterball during any of their collective bargaining negotiations.  (*See* Davis Dep. (doc. # 40-10) at pp. 14-15, 23-24, 96-97; *see also* "Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion for Class Certification and Collective Action Certification" (doc. # 55) at pp. 7, 10 (describing "Butterball's policy of nonpayment for donning and doffing"

and "corporate policy not to pay for donning and doffing")).  *See Andersen v. Cagle's*, 488 F.3d at 959 (custom or practice may exist even though a collective bargaining agreement is silent on the issue of compensation for donning and doffing);  *Saunders v. John Morrell & Co.*, 1991 WL 592542 * 3 (N.D. Iowa Dec. 24, 1991) (that workers not paid for clothes-changing during previous five years demonstrated custom or practice existed for nonpayment); *Sisk*, 590 F. Supp. 2d at 1010 (as CBAs in effect during relevant time period were silent on the issue of compensation for donning and doffing activities, union had acquiesced in company's donning and doffing compensation practice).

An employee may file a grievance for an alleged violation of the terms of the 2005-2008 or 2008-2009 CBAs by following the process set forth in Article 8 of each CBA. (*See* Butterball's Exhibits K, L (docs. # 40-12 and # 40-13) **[under seal]** at Article 8).  Any grievance which cannot be satisfactorily resolved by the parties may be taken to arbitration. (*See id.* at Article 9 **[under seal]** (arbitrator has the power to alter or modify any of the terms and conditions of employment set forth in the Agreement)).  On December 16, 2005, UFCW Local 7 Representative Fernando Rodriquez filed grievance No. 401751-05 with ConAgra, stating: "Violation of Equipment Change. Violation of FLSA 1st Circuit Court Award and violation of Fair Labor Standards Act of 1938." (*See* Butterball's Exhibit M (doc. # 40-14) at p. 3 of 10 **[under seal]**).  In this grievance, the Union claimed "that from the moment employee put on a helmet should be compensated for [sic]." (*Id.* at p. 4 of 10 **[under seal]**).  ConAgra denied the grievance and it proceeded through all three steps of the grievance procedure.  (*See id.* **[under seal]**;  Davis Dep. (doc. # 40-10) at p. 75).  The Union advised ConAgra that it intended to advance the grievance to arbitration. (*See* Butterball's Exhibit M (doc. # 40-14) at p. 7 of 10 **[under seal]**)).

The grievance never actually advanced through the arbitration process. On April 17, 2008, Grievance No. 401751-05 had been resolved without any agreement for donning and doffing pay and was removed from the active grievance file.  (*See* Declaration of Rich

Chosich ("Chosich Dec."), Butterball's Exhibit N (doc. # 40-15) at ¶ 8; Davis Dep. (doc. # 40-10) at pp. 28-29). Plaintiffs conceded at the November 9, 2009 hearing that there is no evidence that Butterball in any way prevented the grievance from advancing to arbitration. In *Arcadi v. Nestle Food Corp.*, the court found a "practice of non-compensation" for clothes-changing time where the issue "was discussed during the negotiations, and the unions understood and accepted Nestle's position." 38 F.3d at 674-75. "Indeed, Local 1974's failure to request arbitration 'settled' the 'practice' under its collective agreement." *Arcadi*, 38 F.3d at 675. *See also Hudson v. Butterball,* 2009 WL 3486780 at * 3 ("union's failure to follow through with . . . grievance shows an acquiescence to nonpayment for donning, doffing, and sanitizing time").

The evidence here supports the conclusion that the Union and Butterball/ConAgra have a long-standing custom or practice of nonpayment for donning and doffing time throughout a series of CBAs.

> The term 'custom or practice' is broad enough to capture a long-standing practice by an employer of nonpayment for clothes-changing time – even if the issue of payment for such time has not been raised in union-management negotiations – provided that the employer can demonstrate that the practice of nonpayment was sufficiently long in duration and that its employees knew of and acquiesced in the practice.

*Kassa*, 487 F. Supp. 2d at 1068 (D. Minn. 2007).

> Precedent establishes that where the union and employer discuss an issue, the result may be custom or practice, even if the collective bargaining agreement is silent on the issue. In Arcadi v. Nestle Food Corp., 38 F.3d 672 (2d Cir.1994), the Second Circuit found that where, as here, the union had requested compensation for changing time and the employer refused, and the final agreement did not compensate for changing time, a practice existed. Id. at 675. Similarly, this court found a practice or custom where the employer refused the union's demand to pay for clothes-changing time, and the collective-bargaining agreement did not mention the issue. Hoover v. Wyandotte Chem. Corp., 455 F.2d 387, 389 (5th Cir. 1972). The court noted specifically that what a union failed to achieve through the process of collective bargaining would not be delivered to it under the provisions of the Fair Labor Standards Act. Id.

*Bejil*, 269 F.3d at 479.

The declaration of Fernando Rodriquez does not prevent a finding of a custom or

practice of nonpayment for donning and doffing time.  (See Rodriguez Affidavit, Plaintiff's Exhibit 23 (doc. # 51-3 at p. 20 of 48)).  Even if the Union did not settle the grievance, the Union did not arbitrate the grievance and did not address donning and doffing pay in collective bargaining, all while a three-year-old grievance on the issue was pending.  (*See* Davis Dep. (doc. # 40-10) at p. 34).  See *Turner v. City of Philadelphia*, 262 F.3d 222, 226 (3d Cir. 2001) (affirming summary judgment on the basis of § 203(o) where the union did not press for pay for clothes-changing time during bargaining).  *See also Conerly v. Marshal Durbin Co.*, 2007 WL 3326836 * 5 (S.D. Miss. Nov.  6, 2007) ("When the parties to a collective bargaining agreement negotiate over an issue and have an understanding that resolves it, a 'practice' exists even in the absence of express terms.").

At a monthly meeting of UFCW Local 7 at the VFW in Longmont, the Union discussed payment for donning and doffing of PPE.  (*See* Salazar Dep. (doc. # 40-2) at pp. 23–29).  A UFCW representative stated that the Union had spoken to Butterball about the failure to pay employees for time spent donning and doffing PPE. (*See id.* at pp. 30-31).  Ms. Salazar personally discussed pay for donning and doffing time with Fernando Rodriquez on at least two occasions.  (*See id.* at pp. 34, 41).  An employee told Ms. Ybarra that the Union had raised the issue of donning and doffing pay at a union meeting.  (*See* Ybarra Dep. (doc. # 40-11) at pp. 29-32; *see also* p. 22 (Ms. Ybarra knew as early as 1978 that she was not paid for donning and doffing time)).  Butterball's position has remained consistent that donning and doffing time was not compensated.  *See Davis v. Charoen Pokphand (USA), Inc.*, 302 F. Supp. 2d 1314, 1321 (M.D. Ala. 2004) (holding that § 203(o) applies where agreement contains no provision for compensation for donning and doffing time and employees knew of company's practice of nonpayment for such time);

The fact that six union employees in the live hang department were compensated for donning and doffing time does not prevent a finding of a custom or practice of nonpayment for donning and doffing time under a bona fide CBA.  That Butterball paid

some employees for donning and doffing time outside the scope of the CBA demonstrates the Union's ability to bargain for donning and doffing pay and choice not to do so.  *See Gatewood v. Koch Foods of Mississippi, LLC*, 569 F. Supp. 2d 687, 701 (S.D. Miss. 2008) ("[W]hen employees and union representatives are conclusively aware of the facts surrounding compensation policies for changing clothes at the beginning and end of each workday, and reach an agreement under a CBA that does not compensate employees for the time, a 'practice' exists under the CBA sufficient to invoke the § 203(o) defense.")

The court finds no genuine issue of material fact that precludes it from recognizing a custom or practice of non-compensation approved by the CBAs.  (*See, e.g.*, Plaintiffs' Reply Memorandum (doc. # 54) ("Both parties agree that the Court should determine as a matter of law whether Defendant may avoid liability under the Fair Labor Standards Act pursuant to 29 U.S.C. § 203(o)."); *see also id.* at p. 2, n. 1 ("there is no fact issue surrounding the custom or practice issue").  Where "both parties, being fully informed of the relevant facts, chose to exclude compensation for donning and doffing activities. . . , § 203(o) operates to remove from the category of 'hours worked' under the FLSA any time that could have been compensable, but had been bargained away by union representatives under a *bona fide* CBA."  *Gatewood*, 569 F. Supp. 2d at 701.  As a matter of law, Plaintiffs and the putative class members may not recover for donning and doffing time, as such time is not "hours worked" under the FLSA.

As the court has determined that Plaintiffs' PPE are "clothes" and that under the governing CBA there is a custom or practice of nonpayment for the time spent donning and doffing, Butterball has carried its burden and is entitled to summary judgment on its § 203(o) affirmative defense regarding time spent donning and doffing.  Thus, the court need not reach the parties' arguments regarding whether time spent donning and doffing "non-unique" PPE is not compensable as not "integral and indispensable" to Plaintiffs' principal production activities or as *de minimis*.  *See Sisk*, 590 F. Supp. 2d at 1011

(concluding that "once an activity has been deemed a section 3(o) activity, it cannot be considered a principal activity"); *Davis*, 302 F. Supp. 2d at 1321 ("Because summary judgment is appropriate on the pre- and post-shift donning-and-doffing claims related to jobs covered by the CBA on the basis of § 203(o), the court need consider [Defendant's] alternative grounds for summary judgment only as they apply to the one job category not covered by the CBA."); *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 724 (E.D. La. 2008) ("since activities covered by § 203(o) cannot be considered 'principal activities' and do not start the work day, the walking time that occurs after a § 203(o) activity is rendered not compensable unless it is otherwise preceded by a principal activity") (citing 2007 DOL Opinion Letter); *Huntington v. Asarco, Inc.*, 2002 WL 1315800 at * 4 ('Plaintiffs also sought compensation for walk time and for time they allege [Defendant] required them to be at the plant before and after paid time. These claims largely overlap the claims for donning and doffing.").[2]

B.      Plaintiffs' Second Cause of Action for Violation of State Law

Plaintiffs allege that Butterball is in violation of the CMWA and Order 24, which require payment for donning, doffing, sanitizing and walking time. (*See* Complaint (doc. 3 1) at ¶ 45).

1.      The Colorado Minimum Wage Act

Butterball argues that the CMWA should be interpreted consistently with the FLSA

---

[2]      There is little evidence in the record currently before the court as to what sanitizing Plaintiffs did. (*See, e.g.,* Complaint (doc. # 1) at ¶ 36 ("Hours worked includes time spent . . . donning and doffing and sanitizing required equipment . . . .); Salazar Dep. (doc. # 40-2) at pp. 67-70 (describing doffing some items into trash cans and returning other items to laundry room); Salazar Interrogatory Responses (doc. # 40-3) at pp. 7-10; Ybarra Dep. (doc. # 40-11) at pp. 36-38, 57-60; Ybarra Interrogatory Responses (doc. # 40-4) at pp. 7-9). *See Huntington*, 2002 WL 1315800 at * 5 ("At trial, Plaintiffs failed to put on more than a scintilla of evidence from which a reasonable jury could find in their favor.").

and thus, Butterball is entitled to summary judgment on Plaintiffs' claims under state law to the same extent that it is entitled to summary judgment under the FLSA.

The Colorado Division of Labor ("CDOL"), a subdivision of the Colorado Department of Labor and Employment ("CODOL"), regulates wages and hours for certain employers and employees in Colorado.  7 Colo. Code Regs. § 1103-1 (2009).  (*See* Butterball's Exhibit CC (doc. # 40-29)).  The CDOL promulgated Order 24.  (*See* Butterball's Exhibit CC (doc. # 40-30)).  Order 24 took effect on January 1, 2008.  *See Bonidy v. Vail Valley Center for Aesthetic Dentistry, P.C.*, 186 P. 3d 80, 82 (Colo. App. 2008) (noting Wage Order 24 takes effect on January 1, 2008).  Effective January 1, 2009, the CDOL issued Colorado Minimum Wage Order Number 25 ("Order 25" or "the Wage Order"), which superseded "all previous Wage Orders."  7 CCR 1103-1.  Order 25 substantively alters Order 24 in only two ways, neither of which affect the issues in this lawsuit.  (*See* Plaintiffs' Memorandum of Law in Opposition (doc. # 51) at p. 43 of 53 n. 24 ("The Wage Order is updated annually and the latest Wage Order is '25.' Despite the change in numbers, the Wage Order has not changed with respect to the issues presented in this motion during the relevant time periods.");  Butterball's Reply in Support (doc. # 56) at p. 27 of 36 n. 10 ("In substance, Orders 24 and 25 are identical in all material respects.")).

Plaintiffs contend that the CMWA should not be construed in accordance with the FLSA because: (1) unlike the FLSA, the CMWA defines "time worked," *see* 7 CCR 1103-1, (2) the CMWA does not incorporate the provisions of the Portal-to-Portal Act, 29 U.S.C. §251 *et seq.*, and (3) the CMWA does not include a definition similar to § 203(o).  The FLSA defines "employ" as "to suffer or permit to work."  29 U.S.C. § 203(g).  For purposes of the FLSA, the Supreme Court defined "work" as the "physical or mental exertion . . . controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer."  *Tenn. Coal, Iron & R. Co. v. Muscola Local No. 123*, 321 U.S. 590, 598 (1944).  Congress somewhat narrowed the Supreme Court's expansive application of the

FLSA by passing the Portal-to-Portal Act, 29 U.S.C. § 251 *et seq.*  Under the FLSA, as amended by Congress in 1947, employees are entitled to compensation only for the performance of the "principal activity or activities" required by their jobs, and not for tasks that are "preliminary" or "postliminary" to them.  29 U.S.C. § 254(a).  The Wage Order defines "time worked" as "the time during which an employee is subject to the control of an employer, including all the time the employee is suffered or permitted to work whether or not required to do so." 7 CCR 1103-1.  The CMWA does not specifically address donning, doffing, sanitizing, and walking activities.  The parties have not cited and the court has not found any Colorado caselaw addressing whether donning, doffing, sanitizing, or walking time falls under the CMWA's definition of "time worked," even if it is excluded from working time by a CBA and not considered compensable "work" under the FLSA.  Because Colorado law does not address donning, doffing, sanitizing, or walking time, the court may apply federal law in analyzing similar issues.  *See, e.g., Flood v. Mercantile Adjustment Bureau, LLC*, 176 P.3d 769, 773 (Colo. 2008) (because Colorado Fair Debt Collection Practices Act "is patterned" on the federal Fair Debt Collection Practices Act, "we look to federal caselaw for persuasive guidance bearing on the construction of our state's law."); *Rutt v. Poudre Educ. Ass'n*, 151 P.3d 585, 590 (Colo. App. 2006) ("when there is no Colorado case law directly on point and the pertinent portions of the Colorado and federal rules statutes are essentially the same federal authority is persuasive in analysis of the Colorado statute"), *rev'd on other grounds*, 184 P.3d 65 (Colo. 2008) (citation omitted); *Chase v. Farmers Ins. Exch.*, 129 P.3d 1011 (Colo. App. 2004) (applying burden of demonstrating an exemption under the FLSA to employer seeking to establish an exemption under Colorado law).  As the court has concluded that under the FLSA, time spent donning and doffing PPE is not compensable "work", it determines that donning and doffing is not compensable under the CMWA for the same reasons.

2.     The Wage Order

Butterball also seeks summary judgment on Plaintiffs' Second Cause of Action for the reason that Butterball is not a "food and beverage" business that is governed by the Wage Order.

The Wage Order applies to private sector employers in the "food and beverage" industry, which is defined as "any business or enterprise that prepares and offers for sale, food or beverages for consumption either on or off the premises." 7 CCR 1103-1. "Such business or enterprise includes but is not limited to: restaurants, snack bars, drinking establishments, catering services, fast-food businesses, country clubs and any other business or establishment required to have a food or liquor license or permit, . . ." *Id.*

Butterball "is a poultry processor which supplies wholesale and retail customers with processed turkey." (*See* Complaint at ¶ 10).  Butterball sells its manufactured raw and cooked turkey products to restaurants, retail, and institutional establishments, which in turn sell the products to the general public. (*See* Ingram Dep. (doc. # 40-7) at pp. 84, 96). Butterball offers its products only for resale by wholesalers and retailers, not to the consuming public.  Butterball does not maintain a Retail Food Establishment license and does not sell any products directly to the public. (*See id.* at pp. 93-94, 96).  Butterball has registered with the Colorado Department of Public Health and Environment as a Wholesale Food Manufacturer and/or Storage Facility. (*See* Butterball's Exhibit H (doc. # 40-9) [**under seal**]).  Butterball does not operate any of the type of businesses specifically mentioned in the Wage Order 24.  (*See* Ingram Dep. (doc. # 40-7) at p. 97).

The Wage Order's provisions are expressly limited to four uniquely defined industries.  The Wage Order provides specific examples of the businesses and enterprises that it defines as "Food and Beverage" industries: "restaurants, snack bars, drinking establishments, catering services, fast-food businesses, country clubs and any other business or establishment required to have a food or liquor license or permit, . . ." 7 CCR

1103-1.  The court interprets these examples as narrowing the definition provided in the Wage Order.  All of the examples describe businesses and enterprises that sell food directly to the consuming public.  If the Wage Order was intended to apply to a processor which supplies wholesale and retail customers with processed food, it could have so stated. Plaintiffs' proposed interpretation of the Wage Order would leave the examples without logical meaning.  Plaintiffs have not demonstrated established that Butterball operates any business or enterprise as described in the examples listed in the Wage Order or that Butterball has a food or liquor license or permit.

The fact raised by Plaintiff, that Butterball occasionally sells its products to its employees, does not  establish that Butterball belongs to the "food and beverage" industry as defined by the Wage Order.  Approximately four times per year, Butterball sells "distressed products that would not be sold to customers because of boxes or torn packaging" to its employees.  (*See* Ingram Dep. (doc. # 40-7) at pp. 90-92).  These employee sales are offered as a benefit to the employees if Butterball has "product that is distressed and it's still a good product. It's a benefit to employees to buy it at a reduced cost." (*Id.* at p. 92).  The court declines to conclude that Butterball's quarterly sales to employees make it a "food and beverage" business that is governed by the Wage Order.

The fact pointed out by Plaintiffs that Butterball produces "ready-to-eat" ("RTE") food products does not bring it within the coverage of the Wage Order.  Butterball does not sell any of its products, including ready-to-eat products, directly to consumers.  Nor does the fact that Butterball maintains a website, www.butterball.com, establish that Butterball is governed by the Wage Order.  Gift certificates may be purchased from the website for redemption at supermarkets and food retailers. *Id.* (citing www.giftcheckprogram.com). Butterball's website also includes a "product locator" feature which "directs consumers to locations where Butterball products may be purchased." *Id.* (citing www.butterball.com/product_locator).  Butterball's website promotes the purchase of

Butterball products from resellers such as grocery stores, but does not provide a means by which a consumer may purchase products directly from Butterball. (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (doc. # 51 at pp. 11-12 of 53)). The court declines to conclude that Butterball's website brings it within the coverage of the Wage Order.

Plaintiffs argue that the CODOL's Advisory Bulletin and Resource Guide, providing that a "bakery that operates on a retail or wholesale basis and prepares and offers food for sale or consumption on or off premises is covered by the Wage Order 25, Section 2, Food and Beverage," demonstrates that Butterball is governed by the Wage Order. (*See* September 2008 CDOL Advisory Bulletins and Resource Guide, Butterball's Exhibit DD (doc. # 40-31)). First, Butterball is not a bakery. Second, the Advisory Bulletin does not by its own terms apply to all wholesale food companies and an employer's status as a wholesaler or retailer alone does not render it a "food or beverage" establishment. If Colorado's regulatory agencies intended that the Wage Order apply to a processor such as Butterball which supplies wholesale and retail customers with processed food, the Wage Order could have been clarified, just as it was clarified for the status of bakeries, yet it was not so clarified. In fact, a document issued by the CDOL indicates that the Wage Order "[d]oes not apply to a variety of other industries such as construction, manufacturing, wholesale." (*See* Butterball's Exhibit CC (doc. # 40-30)).

The court attributes no significance to the informal guidance Butterball sought and received from the CDOL in a November 7, 2008 e-mail. (*See* Butterball's Exhibit EE (doc. # 40-32)). The CODOL subsequently disclaimed the e-mail as an official "position" or "opinion." (*See* Butterball's Exhibit FF (doc. # 40-33)).

For all of the above reasons, the court concludes that Butterball is not a "food and beverage" business of enterprise subject to the Wage Order and is thus entitled to summary judgment as a matter of law on Plaintiffs' Second Cause of Action.

Accordingly, IT IS RECOMMENDED that:

1.      Defendant's Motion for Summary Judgment (filed May 15, 2009) (doc. # 40) be GRANTED and that summary judgment be entered in favor of Defendant Butterball and against Plaintiffs on: (1) Butterball's Thirty First Affirmative Defense to the First Cause of Action under the FLSA, 29 U.S.C. § 207(a)(1), pursuant to 29 U.S.C. § 203(o), and (2) on Butterball's Thirty Second Affirmative Defense to the Second Cause of Action under the Colorado Minimum Wage Act, Colo. Rev. Stat. §§ 8-6-101 *et seq.*, and Colorado Minimum Wage Order 24.

2.      In light of the Recommendation that Defendant's Motion for Summary Judgment be granted, that "Plaintiffs' Motion for Partial Summary Judgment on Butterball's 29 U.S.C. § 203(o) Affirmative Defense" (filed May 15, 2009) (doc. # 41) be DENIED; and

3.      In light of the Recommendation that Defendant's Motion for Summary Judgment be granted, that "Plaintiffs' Motion for Class Certification and Collective Action Certification" (filed May 15, 2009) (doc. # 34) be DENIED AS MOOT.


**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar

*de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule");  *One Parcel of Real Property*, 73 F.3d at 1059-60 (a party's objections to the Magistrate Judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the District Court or for appellate review);  *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 3rd day of December, 2009.

BY THE COURT:


    s/ Craig B. Shaffer
United States Magistrate Judge